IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| PAUL E. YTTRIE, Jr., | ) | Case No.  08 C 50090 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.      Introduction

Paul Yttrie, Jr. seeks judicial review of the Social Security Administration

Commissioner's decision to deny his application for Disability Insurance Benefits ("DIB") under

Title II of the Social Security Act.  *See* 42 U.S.C. § 405(g).  This matter is before the magistrate

judge pursuant to the consent of both parties, filed on July 25, 2008.  *See* 28 U.S.C. § 636(c);

Fed. R. Civ. P. 73.

### II.      Administrative Proceedings

Claimant first filed for disability insurance benefits on August 19, 2003 alleging a

disability onset date of February 26, 2003.  (Tr. 144–45.)  His claim was denied initially and

upon reconsideration.  (Tr. 48–50, 58–60.)  A hearing before an ALJ was held on March 1, 2005,

at which Claimant was represented by an attorney.  (Tr. 597.)  Claimant and a vocational expert,

Mr. Radke, testified.  (Tr. 599, 641.)  On March 29, 2005, the ALJ issued a written opinion

partially in favor of Claimant (the "2005 opinion").  (Tr. 30–42.)  The ALJ found that Claimant

was disabled from February 26, 2003 through February 29, 2004, but was not disabled thereafter. (Tr. 30.)

Claimant requested that the appeals council review the ALJ's decision. (Tr. 87.) The appeals council affirmed that portion of the ALJ's decision finding Claimant disabled from February 26, 2003 through February 29, 2004. (Tr. 87.) The appeals council remanded the case for further consideration regarding the period of time beginning with March 1, 2004. (Tr. 87.)

A hearing was held on May 31, 2006 before the ALJ, at which Claimant and his attorney were present. (Tr. 588.) At that hearing, Claimant's counsel requested that Claimant undergo a psychiatric consultative exam. (Tr. 593.) The ALJ ordered the exam and reset the hearing date. (Tr. 593.)

A third hearing was held on July 26, 2006, at which Claimant was represented by his attorney. (Tr. 657.) Claimant and Mr. Radke testified. (Tr. 657, 688.) On July 28, 2006, the ALJ issued another written opinion finding that Claimant was disabled from February 26, 2003 through February 29, 2004, but not thereafter (the "2006 opinion"). (Tr. 24.) The ALJ also found that the Claimant's "entitlement to a period of disability and disability insurance benefits ended effective May 31, 2004, the end of the second calendar month after the month in which the disability ceased." (Tr. 24.) The appeals council denied Claimant's request for review on March 27, 2008, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 5–7.)

## III.    Background

Claimant was born on May 28, 1964, making him 42 years old at the time of the third hearing. (Tr. 144, 660.) He graduated high school, and is able to read and write the English language. (Tr. 660.) He testified that he can do basic math, but is a bit "shaky." (Tr. 660–61.)

He began having trouble with math shortly after starting pain medication. (Tr. 661.) Claimant ambulates with a cane and a removable, molded plastic leg brace on his left leg that fits underneath the bottom of his foot and goes up to the knee. (Tr. 623, 637, 639.) In the past, he also used crutches and a walker. (Tr. 624.)

At the first hearing, Claimant testified that he watches television and spends time on the computer during his typical day. (Tr. 612.) He also testified that he is unable to do any household chores due to pain, except that he occasionally assists with washing the dishes. (Tr. 613.) He stated that he might do some small repairs around the house. (Tr. 613.) For example, he might install a new connector on a bad cable wire. (Tr. 613–14.) He also stated that he cannot assist with grocery shopping because he is unable walk the entire time. (Tr. 614.) Claimant testified that he would go to the race car track as a spectator three or four times per year. (Tr. 614.) Claimant also testified that he would go fishing about twice per week. (Tr. 615.) Claimant stated that he has a driver's license and leaves the house every day to pick up or drop off his daughter at school, and to maybe run to the gas station. (Tr. 616.) He testified that he rarely goes out at night. (Tr. 616.)

Claimant also testified at the first hearing that he suffers from depression. (Tr. 624.) He stated that he fights with his daughter a lot, and that he is unsure about his relationship with his wife. (Tr. 625–27.) He attributed these things to his depression. (Tr. 624–27.)

At the third hearing, Claimant testified that his daily activities had changed since the first hearing. He stated that the time he spends doing chores around the house is "almost non-existent." (Tr. 670.) He stated that he has not been to the race car track in almost two years. (Tr. 671.) He also stated that he rarely fishes, and that the last time he went fishing was about

3

three weeks prior to the hearing. (Tr. 667.) He testified that he spends six to eight hours of his normal day between 9:00 AM and 5:00 PM sleeping. (Tr. 670.) He stated that, since the third surgery, he spends 60 to 70 percent of his day laying down. (Tr. 674.) Claimant explained that if he does feel motivated, he watches a little television or cuts the grass using the riding lawn mower. (Tr. 673.) He also stated that he might work on small lawn mower engines in his garage. (Tr. 673.)

Claimant testified that he earns a little extra money driving his friend to work. (Tr. 663.) The trip takes between one and two hours round trip. (Tr. 664.) Claimant's friend pays Claimant about $7 per day. (Tr. 663.) On rare occasions, Claimant also gives his friend a ride home after his friend's shift ends. (Tr. 684.)

Claimant also testified at the third hearing that he continues to suffer from depression. (Tr. 680.) He testified that he still fights often with his daughter and has withdrawn from people. (Tr. 680.) He stated that he disagrees with his wife regarding how to raise their daughter, and that he is unsure about his relationship with his wife. (Tr. 627, 681.) He believed that such things are symptoms of his depression. (Tr. 624–27, 680.) He also testified that he began suffering panic attacks about eight or nine months prior to the third hearing, and that he has experienced about nine or ten of them since they started. (Tr. 682.)

Claimant's relevant work history begins in July 1984 as a warehouse laborer for a bar and restaurant supply distributor. (Tr. 170.) He worked that job from 1984 until December 1992. (Tr. 170.) In December 1992, Claimant was promoted to warehouse manager, and held that job until December 1994. (Tr. 170.) There, he prepared all customer orders, did inventory counts, and unloaded trucks. (Tr. 174.) He supervised two people in that position. (Tr. 174.)

From January 1995 to July 1995, Claimant was a warehouse laborer for a wholesale electrical supply distributor. (Tr. 170.) From July 1995 until December 1998, Claimant worked in counter sales for the wholesale electrical supply distributor. (Tr. 170.) In that capacity, Claimant assisted walk-in customers, entered orders, filled customer orders, and assisted in loading material for customers. (Tr. 172.) Claimant would have to frequently lift over 25 pounds in that job, and sometimes would lift 100 pounds or more. (Tr. 172.) He also supervised one person in that position. (Tr. 172.) From December 1998 to the summer of 2003, Claimant did inside sales for the electrical supply distributor. (Tr. 170, 603.) In that capacity, he entered orders, negotiated prices, did returned goods authorizations, and managed inventory. (Tr. 171.) He also was responsible for customer contract maintenance and profiling. (Tr. 171.)

Claimant began experiencing medical problems in February 2003. (Tr. 601.) He had surgeries in April and July 2003. (Tr. 602.) According to Claimant's testimony at the third hearing, the last time he worked was at some point between the second and third surgeries. (Tr. 603.)

IV. **Medical Evidence**

Claimant's relevant medical history begins in late February 2003. Dr. Wright, a neurological surgeon, described in a letter dated February 28, 2003 to Dr. Schiller, Claimant's family physician, that Claimant had substantial disc protrusion in the L5-S1 level and that

Claimant was in severe pain.  (Tr. 231.)  At that time, Claimant was taking Vioxx,[1] Vicodin,[2] and Flexeril.[3]  (Tr. 230.)  Dr. Wright did not believe that surgery was the only option, and suggested that Dr. Jaworowicz, a pain management specialist, evaluate Claimant for an epidural steroid injection.  (Tr. 231.)  Dr. Jaworowicz saw Claimant that afternoon and performed the injection.  (Tr. 255.)

On March 4, 2003, Claimant returned to Dr. Jaworowicz for a follow-up.  (Tr. 254.)  Dr. Jaworowicz noted that Claimant reported still being largely confined to bed, was limping, and used a cane.  (Tr. 254.)  Claimant was given Neurontin[4] and Norco,[5] and underwent a selective nerve root block.  (Tr. 254.)

On March 12, 2003, Dr. Soriano, a surgeon at Swedish American Hospital, wrote that Claimant had been referred to him because Dr. Wright's service was not covered by Claimant's health insurance.  (Tr. 229.)  Dr. Soriano noted that an MRI showed a large disc herniation at L5-

---

[1]Vioxx was used to reduce pain, inflammation, and fever.  Vioxx Information from Drugs.com, http://www.drugs.com/vioxx.html (last visited June 2, 2010).  Vioxx was withdrawn from the U.S. market in 2004.  *Id*.

[2]Vicodin is used to relieve moderate to severe pain.  Vicodin Information from Drugs.com, http://www.drugs.com/vicodin.html (last visited June 2, 2010).

[3]Flexeril is a muscle relaxant used to treat skeletal muscle conditions such as pain or injury.  Flexeril Information from Drugs.com, http://www.drugs.com/flexeril.html (last visited June 2, 2010).

[4]Neurontin is an anti-epileptic medication and can be used to treat some nerve pain.  Neurontin Information from Drugs.com, http://www.drugs.com/neurontin.html (last visited June 3, 2010).

[5]Norco is a combination of hydrocodone and acetaminophen, and is used to relieve moderate to severe pain.  Norco Information from Drugs.com, http://www.drugs.com/norco.html (last visited June 3, 2010).

S1, and that Claimant had severe left-side sciatica.[6]  (Tr. 229.)  Dr. Soriano indicated that they would proceed with a microdiskectomy.  (Tr. 229, 282.)  Dr. Soriano performed the surgery on March 13, 2003.  (Tr. 279–80.)

Claimant returned to the SwedishAmerican Hospital on April 10, 2003 with severe nausea, headache, and tenderness to palpation at his incision wound on his back.  (Tr. 274.)  Claimant was referred to Dr. Daryanani for an infectious disease consultation.  (Tr. 274.)  Dr. Daryanani believed Claimant to have gotten a staph infection and took a culture of the draining fluid.  (Tr. 275.)  He started Claimant on the antibiotics vancomycin and oxacillin.  (Tr. 275.)

Claimant was also referred to Dr. Bernsten for an MRI on April 10, 2003.  The MRI showed fluid within the L5-S1 interspace without enhancement.  (Tr. 246.)  There was some subtle enhancement of the endplate of the inferior aspect of the L5 vertebral body, but Dr. Bernsten believed it to be a normal post-operative finding or secondary to degenerative change.  (Tr. 246.)  There also appeared to be some enhancement in the left anterior epidural space postoperative, which Dr. Bernsten thought consistent with post-operation changes.  (Tr. 246.)

On April 14, 2003, Dr. Soriano performed an operation on Claimant to drain the wound.  (Tr. 271.)  The incision was opened and all the infected areas were irrigated, cleaned, and the disk space biopsied.  (Tr. 271.)  Claimant was discharged on April 15, 2003 with Darvocet[7] and home antibiotics.  (Tr. 269.)

_____

[6]"'Sciatica' refers to pain that radiates along the path of the sciatic nerve and its branches—from your back down your buttock and leg."  Sciatica—MayoClinic.com, http://www.mayoclinic.com/health/sciatica/ds00516 (last visited June 8, 2010).

[7]Darvocet is used to relieve mild to moderate pain.  Darvocet Information from Drugs.com, http://www.drugs.com/darvocet.html (last visited June 3, 2010).

On May 1, 2003, Claimant saw Dr. Root at OSF Saint Anthony Medical Center for an infectious disease consultation. (Tr. 308.) Claimant reported feeling considerable pain in his left hip which was similar to the pain he felt prior to his last surgery. (Tr. 308.) He was continued on antibiotics. (Tr. 309.)

Claimant returned on May 13, 2003 to Dr. Root. (Tr. 307.) He had started taking Neurontin and his pain had gotten better, but his sedimentation rate[8] had remained the same. (Tr. 307.) An MRI was conducted on May 17. (Tr. 376.) The MRI was consistent with diskitis and osteomyelitis involving the inferior endplate of L5 and the superior endplate of S1. (Tr. 376.) It also indicated diskitis within the L5-S1 space and epidural phlegmon with what appeared to be a paravertebral abscess on the left. (Tr. 376.)

At a June 4 follow-up with Dr. Root, Claimant continued to complain of pain. (Tr. 305.) Dr. Root noted that the most recent MRI seemed to indicate that the infection may not have been totally eradicated. (Tr. 305.) At a June 17 follow-up with Dr. Root, Dr. Root noted that Claimant's sedimentation rate had improved, but that his pain had continued. (Tr. 304.)

Claimant visited Dr. Soriano on June 20, 2003. (Tr. 216.) He reported having hip pain and a headache, and Dr. Soriano observed that his sedimentation rate had gone from 27 to 42. (Tr. 216.) Dr. Soriano suggested that Claimant have an MRI. (Tr. 216.) The MRI showed "what appear[ed] to be an anterior collection of purulence." (Tr. 219.) Dr. Soriano ordered an infectious disease consultation. (Tr. 268.)

_____

[8]A sedimentation rate measures the distance that red blood cells fall in a test tube in one hour. Sed rate (erythrocyte sedimentation rate)—MayoClinic.com, http://www.mayoclinic.com/health/sed-rate/MY00343 (last visited June 3, 2010). "The distance indirectly measures the level of inflammation." *Id*

Dr. Homann of the SwedishAmerican Hospital performed the infectious disease consultation on June 25, 2003. (Tr. 263.) A CT scan suggested an acute inflammatory and probably infectious process. (Tr. 265.) Dr. Homann believed that there was a new infection, and suggested that cultures be taken. (Tr. 265.)

On June 27, 2003, Dr. Soriano performed an operation at the L5-S1 to remove the abscess. (Tr. 261.) During the procedure, Dr. Soriano found a pus pocket. (Tr. 262.) As the pus pocket was opened, Claimant's left leg jumped slightly. (Tr. 262.) Endplates were found to be partially eroded in the inferior portion of L5. (Tr. 262.) "[C]opious amounts of antibiotic irrigation were placed in the wound[,]" and the wound was closed after placement of a Blake drain. (Tr. 262.) Claimant was discharged on June 30, 2003 on Neurontin and Vicodin. (Tr. 260.)

Claimant visited Dr. Soriano on July 10, 2003. (Tr. 293.) He reported complete relief from pain in the back and hips, and that the pain was under control in his leg with the use of Neurontin. (Tr. 293.) He was still experiencing a light burning sensation in the lateral calf. (Tr. 293.) He also had developed "an unusual onset of inability to dorsi- or plantar flex his foot[,]" and the foot felt "very unstable." (Tr. 293.) Dr. Soriano put Claimant in a foot brace and suggested that an MRI be taken. (Tr. 293.)

An MRI was conducted on July 12, 2003, which showed a near complete loss of disk height with a tiny amount of increased T2 signal within the disk at the mid L5-S1 level. (Tr. 237.) The exam also showed "slight interval progression in the extensive enhancing soft tissue seen within the surgical site . . . with involvement of the epidural space extending from the L5 down to the mid sacral level, with prominent extension into through the S1 foramen." (Tr. 237.)

There was "extensive enhancement both laterally and anteriorly of the perivertebral soft tissues at the L5, S1 and S2 levels suspicious for a combination of scarring and phlegmonous debris." (Tr. 237.)  There was "a focal 1.5 cm nonenhancing cystic area in the left hemilaminectomy site at L5-S1, which was noted on prior study.  This could represent a seroma or possible underlying abscess."  (Tr. 237–38.)

On July 24, 2003, Claimant returned to Dr. Root for a follow-up.  (Tr. 347.)  Claimant's sedimentation rate had fallen, but he still had significant back and leg discomfort.  (Tr. 347.)  Claimant saw Dr. Root for an infectious disease follow-up on August 6, 2003.  (Tr. 296.)  All signs of infection clinically and by laboratory measures had cleared.  (Tr. 296.)  However, Claimant was experiencing severe pain in his left foot.  (Tr. 296.)  Dr. Root believed it to be reflex sympathetic dystrophy.  (Tr. 296.)

On August 8, 2003, Claimant returned to Dr. Jaworowicz.  (Tr. 252.)  Dr. Jaworowicz noted that Claimant had an extremely flat affect, and his examination indicated mild muscle wasting and atrophy in Claimant's quadriceps and the calf of his left leg.  (Tr. 252.)  Claimant was quite sensitive to light touch over the medial aspect of his left foot.  (Tr. 252.)  Dr. Jaworowicz noted that Claimant walked with a cane.  (Tr. 252.)  He gave Claimant a left lumbar sympathetic block by injecting Claimant with bupivacaine,[9] and prescribed him Neurontin, Norco, and amitriptyline.[10]  (Tr. 253.)

Claimant returned to Dr. Jaworowicz on August 15, 2003.  (Tr. 250.)  Claimant reported

_____

[9]Bupivacaine is an anesthetic.  Bupivacaine Official FDA information, side effects, and uses, http://www.drugs.com/pro/bupivacaine.html (last visited June 8, 2010).

[10]Amitriptyline is used to treat symptoms of depression.  Amitriptyline Information from Drugs.com, http://www.drugs.com/amitriptyline.html (last visited June 8, 2010).

that the bupivacaine injection did not change his symptoms. (Tr. 250.) Dr. Jaworowicz felt this was consistent with type II complex regional pain syndrome. (Tr. 250.) Dr. Jaworowicz increased Claimant's Neurontin prescription, and indicated that he would switch Claimant to Topamax[11] if that did not help. (Tr. 250.) He also started Claimant on a 72-hour Duragesic patch,[12] and increased his amitriptyline prescription. (Tr. 250.) Claimant reported impotence, and Dr. Jaworowicz gave him a Viagra prescription.

On September 4, 2003, Claimant saw Dr. Root for a follow-up regarding his infection. (Tr. 294.) He noted that Claimant had stopped taking Vicodin and Norco, but was still on the Duragesic patch. (Tr. 294.) Claimant reported pain levels at a two to four out of ten in his left leg. (Tr. 294.) He was able to wear a sock and occasionally slippers, which he could not do before. (Tr. 294.)

On September 9, 2003, Dr. Soriano filled out a neurological report sent to him by the Illinois Bureau of Disability Determination Services. (Tr. 204.) Dr. Soriano indicated that Claimant had experienced severe sensory loss in his left foot, had no reflexes in his left ankle or knee, and had a paralyzed left foot. (Tr. 204.) He also described severe atrophy in Claimant's left calf. (Tr. 204.) Dr. Soriano also stated that the condition was longstanding or chronic in nature, that Claimant was using a wheelchair to ambulate, and that he could not ambulate more than 50 feet without assistance. (Tr. 204.) Dr. Soriano indicated that Claimant could not bear

---

[11]Topamax is a seizure medication that is also used to prevent migraines. Topamax Information from Drugs.com, http://www.drugs.com/topamax.html (last visited June 8, 2010).

[12]The Duragesic patch is used for managing moderate to severe chronic pain in patients who need continuous, around-the-clock narcotic pain relief and whose pain cannot be managed by less powerful medications. Duragesic Patch Facts and Comparisons at Drugs.com, http://www.drugs.com/cdi/duragesic-patch.html (last visited June 4, 2010).

weight, but that Claimant was alert and oriented, and could handle funds on his own behalf.  (Tr. 205.)

With the neurological report, Dr. Soriano sent a letter in which he described Claimant as being unable to wear shoes or socks on the left foot due to pain.  (Tr. 202.)  He also noted that Claimant could not walk without a cane and could barely support his weight with a walker.  (Tr. 202.)  Dr. Soriano described Claimant as "basically wheelchair bound," and stated that Claimant was "not capable of driving a car and not capable of caring for himself and is not capable of public transportation."  (Tr. 202.)  Dr. Soriano stated that Claimant could not perform even sedentary work at that time, and that Claimant was completely disabled from a neurological and mechanical standpoint.  (Tr. 202.)  Dr. Soriano also wrote, "Most probably, this will be permanent in nature."  (Tr. 202.)

On September 10, 2003, Claimant reported to Dr. Jaworowicz that the new medication regime had brought his pain to a "one" or "two."  (Tr. 258.)  On October 30, 2003, Claimant reported that his Duragesic patched seemed to be wearing off after 48 hours.  (Tr. 257.)  Dr. Jaworowicz switched his Duragesic use to every 48 hours.  (Tr. 257.)  Claimant also indicated that he had run into financial problems regarding his Neurontin prescription, and that his use of Neurontin had been intermittent for a while which changed his pain levels.  (Tr. 257.)  He was able to get back on it more regularly, though, and he reported doing better.  (Tr. 257.)

A Physical Residual Functional Capacity Assessment completed by Dr. Conroy, a state physician, dated October 17, 2003, indicated that Claimant could lift ten pounds occasionally and frequently, could stand and/or walk at least two hours in an eight hour workday, could sit about six hours in an eight hour work day, could never climb ladders, ropes, or scaffolds, could

occasionally balance, stoop, kneel, crouch, and crawl, and had no manipulative, visual, communicative, or environmental limitations. (Tr. 386–92.) Dr. Conroy projected Claimant's RFC to allow for sedentary work by March 2004. (Tr. 393.)

On May 18, 2004, Claimant saw Dr. York in the Neurosurgery Spine Clinic at Loyola University. (Tr. 412.) Claimant told Dr. York that, since the time of his infection, his lower back and lower extremity pain had gotten worse. (Tr. 412.) He described that pain as radiating down the posterior thighs and on the left lower extremity. (Tr. 412.) He also complained of weakness in his left foot. (Tr. 412.) On examination, Dr. York noted 4/5 strength in all major muscle groups throughout the left lower extremity. (Tr. 412.) She stated that there was some degree of give way weakness, and that it was difficult to determine the absolute degree of strength. (Tr. 412.) She found sensation decreased in the L4 and L5 distributions on the left, and deep tendon reflexes to be 0/4 at the left Archilles. (Tr. 413.) She suggested blood work, an MRI, and an EMG. (Tr. 413.)

An MRI conducted on June 3, 2004 showed old postoperative and degenerative changes at L5-S1 level with an interval resolution of inflammatory edema and enhancement seen previously. (Tr. 416.) An EMG conducted on June 4 showed left L5-S1 radiculopathy, a mild peripheral sensory neuropathy affecting both lower extremities, an absent Hoffmann reflex, and a diminished amplitude of the left peroneal motor nerve response. (Tr. 415.)

Claimant saw Dr. Jaworowicz on July 12, 2004. (Tr. 453.) Claimant indicated that he had been having increasing problems with depression, anxiety, and irritability, and that he had been taking it out on his 11 year old daughter. (Tr. 453.) Dr. Jaworowicz continued Claimant on

his regimen of Neurontin and the Duragesic patch, and started him on Effexor.[13]  (Tr. 453.)

Claimant saw Dr. Schiller for a follow-up regarding his back pain and to get a referral for a psychiatrist on July 15, 2004.  (Tr. 411.)  Dr. Schiller reported that Claimant was "having increasing irritability and stress regarding his chronic illnesses and [that] his family [was] paying the price."  (Tr. 411.)  He also reported that Claimant was experiencing erectile dysfunction.  (Tr. 411.)  Dr. Schiller assessed Claimant as having chronic low back pain which was stable on current medications, although Dr. Schiller noted that Claimant "clearly" had some "discomfort."  (Tr. 411.)  Dr. Schiller assessed Claimant with retrograde ejaculation, and with irritability and other symptoms consistent with depression.  (Tr. 411.)

On Claimant's own referral, Dr. Pearson, a psychologist, conducted a psychological assessment regarding Claimant and issued a report on September 14, 2004.  (Tr. 429.)  Claimant told Dr. Pearson that he was taking Neurontin, Effexor, the Duragesic patch, and Viagra.  (Tr. 431.)  He also told Dr. Pearson that he had problems sitting for long periods of time, problems walking without support, an inability to stand for long periods without fatigue or pain, problems in terms of memory, and occasional feelings of weariness.  (Tr. 431.)  He also stated that he had occasional fears about crowds of people when he was alone.  (Tr. 430.)

Dr. Pearson ran a battery of tests and concluded that Claimant was of average intelligence, but that he was depressed and anxious.  (Tr. 443.)  Dr. Pearson stated that Claimant was "over-reactive and hyper-sensitive," and that Claimant reflected "a number of somatic complaints[.]"  (Tr. 443.)  It appeared "quite likely that these pressures and stresses tend[ed] to

---

[13]Effexor is used to treat major depressive disorder, anxiety, and panic disorder.  Effexor Information from Drugs.com, http://www.drugs.com/effexor.html (last visited June 4, 2010).

focus themselves upon areas of greatest weakness or sensitivity in [his] body." (Tr. 443.) Dr. Pearson also found that Claimant was a bit of a "loner." (Tr. 443.) Dr. Pearson recommended short-term medication and counseling to deal with his depression and anxiety. (Tr. 444.)

Claimant returned to Dr. Jaworowicz on September 30, 2004. (Tr. 457.) Claimant reported having some "mild[,] short-term problems" from the Neurontin, and Dr. Jaworowicz decreased the prescription from 900 mg to 800 mg orally four times per day. (Tr. 457.) Dr. Jaworowicz suggested that Claimant begin a short trial of Topamax instead of the Neurontin. (Tr. 457.) Claimant told Dr. Jaworowicz that the Effexor had stabilized his mood, and Dr. Jaworowicz indicated that he might increase Claimant's Effexor prescription after the conclusion of the Topamax trial period. (Tr. 457.)

On November 8, 2004, Claimant saw Dr. Jaworowicz for a follow-up. (Tr. 462.) Taking Topamax had made Claimant sedated, and Claimant was put back on Neurontin. (Tr. 462.) Dr. Jaworowicz noted that Claimant's complex regional pain syndrom had been medically stabilized, but that his depression and anxiety had gotten worse. (Tr. 462.) He believed Claimant's pain problems were affected by his emotional problems, and he increased Claimant's Effexor prescription to 150 mg per day. (Tr. 462.) Claimant returned to Dr. Jaworowicz for a follow-up on January 3, 2005, at which time he indicated that he had been experiencing occasional, spontaneous "jerking" in all of his extremities and occasionally in his abdomen. (Tr. 463.)

On July 13, 2005, Claimant underwent an MRI authorized by Dr. Jaworowicz. (Tr. 499.) The MRI showed postsurgical changes of the diskectomy at L5-S1 with apparent osseous fusion, and a mild posterior disk bulge at L4-L5, which mildly to moderately narrowed the neural foramina bilaterally. (Tr. 501.) Also, the MRI indicated that at the L5-S1 level, the combination

of an inferior dorsal osteophyte with postsurgical scars and facet hypertrophy moderately narrowed the neural foramina bilaterally without compromising the exiting S1 nerve root. (Tr. 501.)

In mid-August 2005, Claimant fell asleep on the couch and awoke with significant weakness and numbness in his left upper extremity. (Tr. 479.) A CT scan of his brain was conducted on August 24, 2005. (Tr. 465.) It showed nothing abnormal. (Tr. 465.) Claimant saw Dr. Roth, a neurologist, for a review of the problem on September 16, 2005. (Tr. 479.) Dr. Roth indicated that Claimant's motor function in the upper extremities was good, but that the wrist dorsiflexors on the left were weak compared to the right. (Tr. 480.) Claimant also described "patchy decreased sensation in the dorsum of the arm and somewhat in the C-7 distribution of the left hand." (Tr. 480.) Dr. Roth noted that it sounded to him as though Claimant's left arm weakness had improved substantially over the last four weeks. (Tr. 479.) Dr. Roth predicted that Claimant had radial nerve palsy or Saturday night palsy from sleeping with pressure on his radial nerve. (Tr. 480.) Dr. Roth ordered an MRI and an EMG to rule out more serious problems. (Tr. 480.)

Claimant was seen by Dr. Roth on October 11, 2005. (Tr. 481.) At that time, Claimant was describing more of an ulnar distribution numbness. (Tr. 481.) Dr. Roth noted that an EMG had been conducted and Claimant's left upper extremity "looked okay." (Tr. 481, 485.) Dr. Roth ordered an MRI of Claimant's spine. (Tr. 481.) The MRI, conducted on October 19, 2005, showed "essentially unremarkable" results, but some "minimal prominence of the nasopharyngeal tissues," noted to probably be "normal lymphoid tissue." (Tr. 483.) On November 8, 2005, Claimant saw Dr. Roth and described some decreased motor function in the

left arm, although he was able to do most things.  (Tr. 488.)  He also described intrascapular back pain.  (Tr. 488.)  Dr. Roth predicted a gradual resolution of Claimant's symptoms.  (Tr. 488.)

Claimant saw Dr. Jaworowicz for a follow-up on December 7, 2005.  (Tr. 498.)  Claimant reported having trouble sleeping on his Neurontin.  (Tr. 498.)  Dr. Jaworowicz suggested a trial of Lyrica[14] instead of the Neurontin.  (Tr. 498.)  At a May 22, 2006 follow-up, Dr. Jaworowicz noted that Lyrica was inadequate at controlling Claimant's symptoms.  (Tr. 576.)  He stated that Claimant reported that his depressive-type symptoms had gotten worse.  (Tr. 576.)  Claimant's prescription for Effexor was doubled to 300 mg daily.  (Tr. 576.)  Claimant also indicated that he continued to have nerve pain from the left knee down to the foot, and that it was a five to six out of ten.  (Tr. 574.)

The ALJ referred Claimant to Dr. Hoffman for a psychiatric evaluation which took place on June 27, 2006.  (Tr. 560.)  Dr. Hoffman interviewed Claimant for 1.5 hours.  (Tr. 560.)  Dr. Hoffman indicated that Claimant was difficult to interview because his responses were slow and he did "not want[] to look" at Dr. Hoffman.  (Tr. 560.)  Claimant told Dr. Hoffman that he had memory problems, especially with dates and addresses, and stated that he needed to write things down to remember them.  (Tr. 560.)  Dr. Hoffman found Claimant's alleged memory problem inconsistent with Claimant's ability to remember, and to drive to, his appointment.  (Tr. 560.)  Dr. Hoffman also found Claimant's alleged memory problems inconsistent with the psychological record established by Dr. Pearson, in which Claimant appears to remember his

---

[14]Lyrica is used to control seizures, treat fibromyalgia, and to treat pain caused by nerve damage.  Lyrica Information from Drugs.com, http://www.drugs.com/lyrica.html (last visited June 7, 2010).

history without difficulty.  (Tr. 560.)  Dr. Hoffman wrote, "I am puzzled when a history is given by someone who 'remembers that they cannot remember.'" (Tr. 506.)  Dr. Hoffman concluded, "[Claimant's] alleged memory problems are spotty and inconsistent."  (Tr. 560.)

Claimant told Dr. Hoffman that his feelings of depression onset when he was told by doctors that he was permanently disabled.  (Tr. 561.)  He stated that he is irritable, cantankerous, and impotent, and has marital problems.  (Tr. 561.)  He was worried about losing his wife and daughter.  (Tr. 561.)  Claimant told Dr. Hoffman that he has interests but lacks motivation or energy to do them.  (Tr. 561.)  He also stated that he has insomnia sometimes related to pain and sometimes related to thinking too much about his daughter, bills, losses of property, and other things.  (Tr. 561.)  Dr. Hoffman noted that Claimant was not suicidal. (Tr. 561.)  Claimant admitted at the end of the interview that he has panic attacks, where he suffers hyperventilation and tachycardia.  (Tr. 561.)  He did now know of any situational triggers.  (Tr. 561.)

Dr. Hoffman described Claimant as being oriented in three spheres, but noted that Claimant described himself as "bummed out without ambition" and that he told Dr. Hoffman that he could "call it depressed."  (Tr. 561.)  Dr. Hoffman found that Claimant was not anxious, had no perceptual distortions or supportive delusions, had no paranoia, could concentrate on spelling words backwards and could spell them "essentially correct," albeit slowly, and could use good judgment knowing what to do to get out of a fire.  (Tr. 561.)  He also found that Claimant thought abstractly correctly forming categories of objects, had fair immediate registration and recall remembering three of five random words after five minutes, had recent and remote memory knowing yesterday's events, knew where he was born, and knew the names of his high school and junior high.  (Tr. 561.)

When asked about his typical daily activities, Claimant "laugh[ed] and [said] 'not much.'" (Tr. 561.)  Claimant stated that he typically watches television and sleeps a lot.  (Tr. 561.)  He told Dr. Hoffman that he would sometimes tinker in the garage, and that he mows the lawn with a riding mower.  (Tr. 561.)  Claimant reported having a good friend with whom he went fishing, although their fishing trips had become more rare.  (Tr. 561.)

Dr. Hoffman noted that Claimant had a slight limitation in the ability to carry out detailed instructions, but commented, "He did everything I asked him to do."  (Tr. 563.)  Dr. Hoffman found that Claimant had moderate limitations in interacting appropriately with the public and responding appropriately to work pressures in a usual work setting.  (Tr. 564.)  Dr. Hoffman also found that Claimant's physical agility was "slow."  (Tr. 564.)

Dr. Hoffman diagnosed Claimant with a chronic pain disorder associated with both psychological factors and a general medical condition.  (Tr. 562.)  He also diagnosed Claimant as having an adjustment disorder with anxiety and depressed mood in reaction to physical travail and imposed limitations on freedom to move about and to be competent.  (Tr. 562.)  Dr. Hoffman found that Claimant's demeanor, at the time of the interview, was inconsistent with depression and anxiety, and believed Claimant's primary affect to be anger over what he considered medical mismanagement and lack of empathetic concern for his situation.  (Tr. 562.)  Dr. Hoffman also found that Claimant had a history suggestive of panic disorder without agoraphobia, but that full criteria seemed to be lacking.  (Tr. 562.)  He also indicated that Claimant had a history suggestive of amnestic disorder, not otherwise specified.  (Tr. 562.)

Claimant saw a licensed clinical social worker, Kathleen Kwiat-Hess, from December 10, 2004 until July 2006 regarding emotional issues that he was facing.  (Tr. 471.)  It appears as

though Claimant visited her every couple of weeks, but her notes are mostly illegible.  (Tr. 471–77, 489–91, 493–94, 559.)  She did note that he and his wife were having trouble, especially in parenting their daughter.  (Tr. 408.)  She also noted that he was upset because of financial difficulties.  (Tr. 472, 490.)  In May 2005, Kwiat-Hess wrote that Claimant continued to be in a negative frame of mind.  (Tr. 474.)

## V.     Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence.  42 U.S.C. § 405(g).  The ALJ's legal conclusions are reviewed de novo.  *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997).  However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]."  *Id*.  The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner.  *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm.  42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion."  *Binion*, 108 F.3d at 782.  If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence.  *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).  However, if the ALJ's decision "lacks evidentiary support or is so poorly

articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.    Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

## VII.    Analysis

### A.    Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in

substantial gainful activity.  20 C.F.R. § 404.1520(b).  Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit.  20 C.F.R. § 404.1510.  If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ found that "[t]here was no evidence of work after the alleged onset date in this case."  (Tr. 15.)  Neither party disputes this determination.  As such, the ALJ's Step One determination is affirmed.

**B.      Step Two: Does the Claimant Suffer From a Severe Impairment?**

Step Two requires a determination whether the claimant is suffering from a severe impairment.[15]  A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c).  If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ noted that on or before the onset date, Claimant had the following impairments: degenerative disease of the lumber spine, complex regional pain syndrome, and depression/anxiety.  (Tr. 15.)  Because these medically determinable conditions significantly limited Claimant's ability to perform basic work activity, the ALJ recognized these impairments as "severe impairments" under 20 C.F.R. § 404.1520(c).

---

[15] The claimant need not specify a single disabling impairment, as the Commissioner will consider combinations of impairments.  *See, e.g.*, 20 C.F.R. § 404.1520(c).  To simplify, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

Neither party disputes this determination.  Thus, the ALJ's Step Two determination is affirmed.

**C.  Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  The listings describe, for each of the body's major systems, impairments which are considered severe enough per se to prevent a person from doing any significant gainful activity.  20 C.F.R. § 404.1525(a).  The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry.  *Bowen v. New York*, 476 U.S. 467 (1986).  Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In the 2006 opinion, the ALJ found that Claimant's impairments do not meet or medically equal the level of severity contemplated by any of the listings in 20 C.F.R. pt. 404, subpt. P, app. 1.  (Tr. 16.)  In doing so, the ALJ incorporated his analysis in his 2005 opinion.  In the ALJ's 2005 opinion, the ALJ found that, "[a]lthough the claimant has had lower back pain, radiating to the lower extremities, with some loss of sensation and reflex capacity, none of the parts of Listing Section 1.00 are met or equaled."  (Tr. 31.)  The ALJ stated that he "considered the claimant's anxiety, depression, and personality disorder."  He found, however, that "none of these mental impairments meet the requirements of Listing Section[s] 12.04, 12.06B, or 12.08."  (Tr. 31.)  The ALJ wrote, "The claimant has had moderate limitations in the 'B' criteria, including activities of daily living, maintaining social functioning, and difficulty with concentration, persistence, or pace.  The claimant has never had any episode of decompensation.  No Listing C criteria have been established."  (Tr. 31.)

23

Neither party challenges the ALJ's Step Three determination. Thus, the court affirms that portion of the ALJ's decision. The analysis proceeds to Step Four.

**D.      Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his limitations. *Id.* Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a); Social Security Ruling 82-62. If the claimant's RFC allows him to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

The ALJ's 2006 opinion states that Claimant's RFC through February 29, 2004 permitted "lifting/carrying up to 10 pounds at a time more than occasionally, but does not possess the capacity to sustain activities of work, including lifting/carrying, sitting, standing and walking for a combined total of six to eight hours per day, five days per week." (Tr. 16.) Given this RFC,

the ALJ found Claimant disabled from February 26, 2003 through February 29, 2004. That finding was affirmed by the appeals council and is not at issue in the district court. (Tr. 17–18.) The ALJ then found that Claimant's RFC as of March 1, 2004 was the following:

> claimant is able to lift/carry up to ten pounds occasionally; the claimant can lift lighter items, such as small hand tools and individual cases, on a frequent basis; the claimant can stand/walk for up to a combined total of two hours, in an eight hour workday and can stand/walk for not more than 15 minutes, continuously; the claimant can sit, with normal breaks, for up to six hours in an eight hour day; the claimant must be able to alternate from a sitting to a standing position, every 20 minutes, for a period of two to three minutes on each occasion; the claimant must be allowed to use a cane for the purpose of ambulation; the claimant may not climb ladder[s], ropes or scaffolds; but is otherwise able to climb ramps, as well as stairs, and the claimant can balance, stoop, kneel, crouch, crawl no more than occasionally; the claimant must avoid exposure to hazards, such as exposed and unprotected heights, excavations, and dangerous moving machinery; the claimant does not possess the capacity to understand, recall, focus upon, attend to or carry out complex/detailed tasks; and the claimant cannot attend to or perform complex/detailed tasks; but the claimant retains the capacity to understand, recall, focus upon, attend to and carry out simple routine instructions and to perform simple, routine tasks at a sustained/workmanlike pace; and, the claimant may not perform work which requires more than incidental contact with the general public or which requires frequent change in work processes and procedures.

(Tr. 16.)

In determining Claimant's RFC for the time period beginning March 1, 2004, the ALJ accounted for Claimant's testimony at the 2005 and the 2006 hearings. The ALJ found important Claimant's testimony that he had persistent lower back pain which radiated to the legs. (Tr. 16.) The ALJ noted that Claimant reported that the level of severity of the pain was a two to three on a scale of ten with medications. (Tr. 16.) The ALJ recalled Claimant's testimony that he used a cane to ambulate, and that he wore a plastic leg brace. (Tr. 16.) He also recalled Claimant's testimony that he had experienced sciatic pain during the winter of 2004–2005, but that it had somewhat improved and leveled off by the time of the 2005 hearing. (Tr. 16.) The

ALJ noted Claimant's testimony that he needed to lie down for 60% to 70% each day.  (Tr. 16.)

The ALJ took note of Claimant's testimony that he drove a pick-up truck for his neighbor on an intermittent basis, but that the trips never took more than one or two hours per day.[16]  (Tr. 17.)

The ALJ found important that, at the March 2005 hearing, Claimant "reported that for about a year prior (i.e., March 2004) he had been able to do things like occasionally go to the race track, occasionally do dishes, go fishing (in nice weather) about once or twice per week, and to take his daughter to and from school."  (Tr. 18.)  The ALJ also took note of Claimant's testimony that he began suffering from depression in July 2003, and that symptoms included including yelling at his daughter, "laying around the house doing nothing three to five days per month, and . . . increased sleeping."  (Tr. 16.)

At the 2006 hearing, Claimant testified that his daily activities had changed since the 2005 hearing.  The ALJ noted Claimant's testimony that he is no longer able "to use his computer for an hour or so during the day and is no longer able to visit the race car track as a spectator a few times per week."[17]  (Tr. 17.)  The ALJ discussed Claimant's testimony that he has been unable to go fishing as often as he had in the past, and now only goes "occasionally."  (Tr. 17.)  The ALJ also noted that Claimant no longer drives his daughter to school, but that he occasionally mows the lawn and tinkers in the garage.  (Tr. 17.)  The ALJ took note of Claimant's testimony that his motivation has been poor since the winter of 2005–2006, and that

---

[16]  The money that Claimant earned from this job is inconsequential with respect to Claimant's eligibility for social security benefits in this case.  (Tr. 17.)

[17]The ALJ is correct that Claimant testified that he no longer goes to the race track, however, the ALJ incorrectly stated the frequency with which Claimant testified he went to the race track in the past.  Claimant testified that he used to go to the race track a couple of times per year, not a couple of times per week.  (Tr. 614.)

he sleeps for six to eight hours during the day.  (Tr. 17.)

The ALJ discussed Claimant's testimony from the 2006 hearing regarding his pain levels. The ALJ noted  Claimant's testimony that he had continued to have low back pain which radiated down the left leg and sometimes down the right leg, and that it had worsened in the winter of 2005–2006 to a persistent level of five to six out of ten.  (Tr. 17.)  The ALJ also noted that Claimant reported the pain levels to be eight or nine out of ten a few days per week, and that on those days, Claimant remains flat on his back.  (Tr. 17.)  The ALJ thought important that Claimant's testimony confirmed that, as of March 2005, his pain had generally been at a two or three out of ten.  (Tr. 17.)  Claimant attributed increased pain levels to an inability to afford pain medication.  (Tr. 17.)  Claimant's testimony indicated that he still uses a cane to ambulate, wears a leg brace, and uses the Duragesic patch .  (Tr. 17.)

The ALJ noted Claimant's testimony that he still lays down 60% to 70% each day.  (Tr. 17.)  The ALJ also noted Claimant's testimony that he still suffers symptoms of depression.  (Tr. 17.)  Specifically, Claimant testified that he yells at his teenage daughter, becomes angry with his wife, is no longer sociable, withdraws from other people, feels helpless, and lacks motivation.  (Tr. 17.)  He testified that his depression symptoms have increased since the winter of 2005–2006.  (Tr. 17.)  The ALJ also relied on Claimant's testimony that he suffers panic attacks.  (Tr. 17.)

In determining Claimant's RFC, the ALJ also accounted for the medical evidence in the record.[18]  The ALJ relied on Dr. Jaworowicz's September 10, 2003 report that noted significant

---

[18]The ALJ's 2006 opinion adopts and incorporates certain analyses and facts from his 2005 opinion.  Those portions of the ALJ's 2005 opinion that have been incorporated in the 2006 opinion will be considered by this court when reviewing whether the ALJ's 2006 determination

improvement in pain symptoms and increased functionality, and that the symptoms had remained stable through October 30, 2003.  (Tr. 18.)   The ALJ also relied on the October 2003 Physical Residual Functional Capacity Assessment, which projected that Claimant would be able to do sedentary work by March 2004.  (Tr. 18.)

The ALJ relied on the May 2004 records of Dr. York[19] that indicated that Claimant complained of low back and left leg pain, the latter of which was described as a "burning sensation."  (Tr. 35.)  Claimant also complained of left leg weakness and erectile dysfunction at that time.  (Tr. 35.)  The ALJ noted that Dr. York's report indicated that Claimant had "full strength, with the exception of the left leg, with left leg strength of 4/5," although there was some "giveway weakness," and some loss of sensation on the left at the L4-L5 distribution.  (Tr. 35.)

The ALJ also relied on the testing results from June 2004, which showed "the presence of unquantified left L5-S1 radiculopathy, mild peripheral sensory neuropathy of the legs, absence of left leg reflexes, and a slightly diminished amplitude of the left peroneal motor nerve response."  (Tr. 35.)  The ALJ noted testing results which showed "old postoperative degenerative changes at L5-S1, with a resolution of previously reported inflammatory edema, . . . [and] marked disc space narrowing, with endplate sclerosis at L5-S1."  (Tr. 35.)  The ALJ noted that the narrowing was stable.  (Tr. 35.)

The ALJ noted Dr. Jaworowicz's July 12, 2004 report which indicated that Claimant's pain symptoms had been "successfully controlled with Duragesic."  (Tr. 36.)  The ALJ also

_____

is based on substantial evidence in the record.

[19]The ALJ erroneously attributes these records to Dr. Schiller.  (Tr. 35.)

observed that Dr. Jaworowicz's report indicated that Claimant was having increasing problems with depression, anxiety, and irritability, and that he reported taking these problems out on his daughter. (Tr. 36.) It was at this meeting that Dr. Jaworowicz started Claimant on Effexor. (Tr. 36.) The ALJ also wrote, "Although [Dr. Jaworowicz] also noted that the claimant is probably disabled, on a permanent basis, the meaning of this comment is unclear, because there was no specific limitation upon activity that was reported." (Tr. 36.)

The ALJ discussed Dr. Schiller's July 15, 2004 report, in which he noted that Claimant was reporting having "a little back pain,"[20] and that Claimant was experiencing increased irritability regarding his illness. (Tr. 36.) Dr. Schiller's report indicated that there had been no specific lumbar or leg abnormality reported on examination and that chronic low back pain was reported as stable on medications. (Tr. 36.) The ALJ noted, though, that Claimant "clearly had some discomfort of the low back," and showed symptoms of depression. (Tr. 36.)

The ALJ also noted Dr. Jaworowicz's July 2004 report that Claimant's pain symptoms had been successfully controlled by the Duragesic patch, and that Dr. Jaworowicz noted stability and "far more functional capacity." (Tr. 18.) The ALJ also took note that Dr. Jaworowicz reported problems with anxiety and depression, for which Effexor was prescribed. (Tr. 18.)

The ALJ discussed Dr. Pearson's 2004 psychological report, which indicated that Claimant had problems with his daughter, an occasional fear of crowds, some memory problems, and some physical problems. (Tr. 18.) Dr. Pearson's report stated that Claimant had a subdued

---

[20]Dr. Schiller's report actually states, "[Claimant] comes in to follow-up a little bit of his back pain." (Tr. 411.) It is unclear whether "a little bit" refers to the extent to which Claimant is going in to "follow up," or whether it refers to the intensity of back pain that Claimant was feeling at the time. The difference is inapposite to the court's opinion.

affect and slightly depressed mood, and was somewhat anxious.  (Tr. 18.)  The ALJ noted that

Dr. Pearson's report showed great tenacity and stamina, and no cognitive deficiencies other than

some deficits in remote memory.  (Tr. 18, 36.)  The ALJ observed that figure testing revealed

oppositional tendencies, a reduced need for interaction with others, and possible poor

coordination of impulses and behavior.  (Tr. 36.)  The ALJ noted that the Bender Gestalt testing

indicated possible anxiety, mood expansiveness, and possible features of anger, hostility, and

withdrawal.  (Tr. 36.)  The ALJ also noted that testing revealed an "unquantified deficit in short-

term memory, but no deficit in attention."  (Tr. 36.)  Sentence completion testing revealed

possible marital problems and some evidence of depression.  (Tr. 36.)  Inkblot testing revealed

some suspiciousness, anxiety regarding physical well-being, and some depression.  (Tr. 36.)  The

ALJ wrote that the tendencies revealed by these tests "had not been previously suggested as

actual symptoms within the medical record."  (Tr. 18.)  Dr. Pearson also indicated that

Claimant's depression may interfere with progress and treatment of his physical impairments,

but the ALJ wrote that this indication was "not otherwise reported in the record."  (Tr. 37.)  The

ALJ noted that pain profile testing completed by Dr. Pearson "referenced modest levels of

anxiety and a possible anger control deficit," as well as potential discomfort with social

situations.  (Tr. 37.)  Antidepressants and counseling were suggested.  (Tr. 37.)

The ALJ noted that Dr. Pearson made the following diagnoses: "anxiety; a dysthymic

disorder; passive/aggressive features; and a dependent and avoidant personality disorder."  (Tr.

37.)  The ALJ also observed Dr. Pearson's notation that overreaction to pressure could possibly

result in gastric symptoms of tiredness, although the ALJ found that this notation was not

previously in the record.  (Tr. 37.)  The ALJ also found important that, irrespective of testing

results, Dr. Pearson opined that Claimant "would be successful in a vocation such as inside sales work, if within his physical limitations."  (Tr. 18.)

The ALJ noted Dr. Jaworowicz's September 2004 report that Claimant's mood had stabilized on Effexor, but observed that by November 2004 Dr. Jaworowicz's notes indicate that Claimant's depression and anxiety had become worse.  (Tr. 37.)  The ALJ observed Dr. Jaworowicz's opinion that emotional symptoms were playing a big part in his current pain symptomology, but considered that no specific physical examination was given and no symptoms were identified.  (Tr. 37.)  Dr. Jaworowicz increased Claimant's prescription of Effexor, but did not impose any specific limitations upon Claimant's activity.  (Tr. 37.)

The ALJ observed that Claimant began counseling sessions with Ms. Kwiat-Hess in December 2004, and that Claimant complained of anger towards his daughter, sexual difficulties, frustration with the inability to work, and a tendency to sleep.  (Tr. 18.)  The ALJ wrote that Claimant "complained of no other symptoms and no other mental status abnormalities" at that time, and that through February 2005, Ms. Kwiat-Hess's notes "pertained only to relationships [*sic*] difficulties among claimant, his daughter and his spouse."  (Tr. 18–19.)  The ALJ noted that concurrent records from Dr. Jaworowicz through January 3, 2005 "revealed continued stability of pain symptoms (without reported exacerbation) on Duragesic, Effexor and Neurontin."  (Tr. 19.)  The ALJ noted that no symptoms of anxiety or depression were reported at that time.  (Tr. 19.)

The ALJ took note of Dr. Roth's August 2005 reports that described numbness and loss of function in Claimant's left hand.  (Tr. 19.)  The ALJ noted that the CT scan showed no abnormalities, and no physical examination information was provided.  (Tr. 19.)  The ALJ

observed that on September 16, 2005, Claimant told Dr. Roth that his left arm had improved, and that Claimant's history of back pain, left leg pain, and left leg weakness had been stable with medication. (Tr. 19.) He also denied depression, anxiety, and difficulty concentrating. (Tr. 20.) Claimant was still using a cane and a leg brace at that time. (Tr. 19.) Strength in his upper extremities was good, but there was some weakness in the left wrist. (Tr. 19.) The ALJ noted that Dr. Roth believed Claimant to have suffered a radial nerve palsy from sleeping in an awkward position, and expected Claimant to continue improving. (Tr. 19.) He also noted that an MRI of Claimant's head and an EMG conducted in September 2005 were negative for abnormalities, and exams showed no ulnar nerve abnormalities in October 2005. (Tr. 19.) Another MRI was conducted in October 2005 of the lumbar spine, and it was unremarkable. (Tr. 19.) The ALJ found important that in November 2005, Claimant reported being able to do most things with his left arm, and the doctor advised that further testing would not be pursued. (Tr. 19.) At that time, the ALJ noted that Claimant was instructed "to follow-up with any worsening of symptoms." (Tr. 19.) The ALJ found significant that there "is no record of any such follow-up and the record reveals no on-going report of residual left arm symptomology." (Tr. 19.) Also, Claimant reported no left arm symptoms during the July 26, 2005 hearing. (Tr. 19.)

The ALJ discussed the December 2005 report from Dr. Jaworowicz, in which the doctor noted that Claimant was experiencing radiating low back pain and sleepiness problems from the Neurontin. (Tr. 20.) There were no complaints of hand paresthesia, depression, or anxiety at that time. (Tr. 20.) The ALJ noted that Claimant's medications were altered and reports of sleepiness do not appear later in the record. (Tr. 20.)

The ALJ relied on the May 2006 report from Dr. Jaworowicz that found that Claimant's

pain had been managed with Duragesic and Neurontin, but that the Neurontin had been discontinued for Lyrica and that pain had increased. (Tr. 20.) The ALJ noted that "[n]o limitations upon activity were reported by the doctor, and no physical examination information was provided." (Tr. 20.)

The ALJ also relied on Dr. Hoffman's report from June 2006. (Tr. 20.) The ALJ noted Dr. Hoffman's opinion that Claimant's purported memory problems were at odds with his presentation to Dr. Pearson in September 2004, at which time Claimant appeared to recall his history without difficulty. (Tr. 20.) Dr. Hoffman's notations indicate that Claimant became depressed when doctors told him that he was permanently disabled. (Tr. 21.) However, the ALJ wrote, "It is observed that no such medical source statement appears within the medical record." (Tr. 21.) The court is unsure whether the ALJ's comment was directed towards Claimant's proposition that he was permanently disabled, or towards Claimant's proposition that he became depressed when doctors told him that he was permanently disabled.

The ALJ noted that Claimant reported to Dr. Hoffman that he had on-going marital and family problems due to irritability, that he lacked interest and motivation, and that he was impotent. (Tr. 21.) The ALJ observed that Claimant's impotence had been reported rectified by Viagra prescriptions. (Tr. 21.) The ALJ also noted that Claimant told Dr. Hoffman that he was "bummed out," that he was not anxious, and that he did not have hallucinations, delusions, or deficiencies in concentration or ability to abstract. (Tr. 21.) The ALJ also took note that Claimant exhibited slowness and a tendency not to look Dr. Hoffman in the eye when answering questions, and that he had some slowness when spelling backwards. (Tr. 21.) The ALJ considered Claimant's report to Dr. Hoffman that he had suffered panic attacks for the year prior.

(Tr. 21.)

The ALJ found important that Dr. Hoffman's report indicated that Claimant complained of depression and anxiety, but that his demeanor was inconsistent with his claims. (Tr. 21.) The ALJ also found important that Dr. Hoffman's report suggested that the primary affect experienced by Claimant was anger over a perceived medical mismanagement of his back problem. (Tr. 21.)

The ALJ noted that Dr. Hoffman diagnosed Claimant with the following: pain disorder with both psychological factors and general medical condition, chronic; adjustment disorder with anxiety and depressed mood; and a history suggestive of panic disorder, without agoraphobia, though the ALJ noted that full criteria seemed to be lacking for this disorder. (Tr. 21.) The ALJ wrote that Dr. Hoffman had noted a reported history of amnesiatic disorder, but had observed that there was no evidence of a "true dementia." (Tr. 21.) Dr. Hoffman also wrote, "[Claimant] claims to be depressed and anxious but his demeanor, at this time, is inconsistent with his claim. His primary affect seems to be anger over what he considers medical mismanagement and lack of empathetic concern for his situation." (Tr. 562.)

The ALJ took note that Dr. Hoffman assessed Claimant as having "slight limitations (defined as mild, but the individual can generally function well) in [his] abilities to deal with detailed instructions, interact with coworkers/supervisors, and respond to work setting changes." (Tr. 21.) (*sic* throughout). The ALJ also took note that Dr. Hoffman found Claimant to have moderate limitations "(defined as moderate, but still able to function satisfactorily) in dealing with the public and in responding to work pressures[.]" (Tr. 21.) The ALJ wrote, "[Dr. Hoffman] opined that reported focus of pain and perceived limitations would decrease with

34

demands of the job. It would therefore appear that lesser demands would generate lesser symptomology. It is further observed that at a minimum . . . claimant remained able to function satisfactorily in all mental activities at work." (Tr. 21.)

The ALJ's RFC determination must be based on substantial evidence in the record, and the ALJ must draw a logical bridge from that evidence to his RFC determination. In this case, the ALJ's RFC determination is not based on substantial evidence in the record, and the ALJ failed to draw a logical bridge from evidence in the record to his RFC determination.

To begin, the court finds that the record amply supports Claimant's proposition that he suffers from chronic pain. In September 2003, Dr. Soriano described Claimant's pain as "chronic" or "permanent in nature." Dr. Jaworowicz and Dr. Schiller both indicated in July 2004 that Claimant's pain is chronic or permanent. Dr. Hoffman diagnosed Claimant with chronic pain disorder in June 2006. Although medication seems to alleviate Claimant's pain somewhat, it is clear that Claimant will likely have pain for the rest of his life.

There is also evidence in the record that indicates that Claimant began to suffer from depression around the time that he was diagnosed with chronic pain. On August 8, 2003, Claimant presented to Dr. Jaworowicz with "flat affect," and he was prescribed amitriptyline, an antidepressant. Claimant told Dr. Jaworowicz in July 2004 that he was having symptoms of depression, anxiety and irritability. Dr. Schiller noted in July 2004 that Claimant was "having increasing irritability and stress regarding his chronic illness." To the extent that the ALJ disregarded Claimant's statements to Dr. Hoffman that he became depressed when doctors told him that he was permanently disabled because "no such medical source statement appears within the medical record," the ALJ is incorrect.

The record also indicates that Claimant's depression and anxiety may have affected his pain levels. Dr. Pearson's report from 2004 stated that Claimant's depression might interfere with progress and treatment of his physical impairments. Also, Dr. Jaworowicz's November 2004 report indicated that emotional symptoms were playing a role in Claimant's pain symptomology at that time. Thus, to the extent that the ALJ found that Dr. Pearson's indication was "not otherwise reported in the medical record," the ALJ is wrong.

Claimant's physical limitations as of the third hearing may properly be accounted for in the ALJ's RFC determination, and there may be substantial evidence in the record to support that RFC determination as of the date of the third hearing. Starting in September 2003, Dr. Jaworowicz, Claimant's pain management specialist, indicated that Claimant's pain symptoms had begun to improve and that he was experiencing an increase in functionality. Dr. Jaworowicz's and Dr. Schiller's notes from July 2004 indicated that Claimant's pain stabilized with the use of medications, including Neurontin and the Duragesic patch. In January 2004, Dr. Jaworowicz indicated that Claimant's pain symptoms had continued to remain stable. In November 2004, Dr. Jaworowicz noted that Claimant's complex regional pain syndrome had been medically stabilized. In August 2005, Claimant told Dr. Roth that his back pain, left leg pain, and left leg weakness had been stable with medication. In December 2005, Dr. Jaworowicz noted that Claimant was experiencing back pain, but the record does not reflect whether it was more than usual. By May 2006, the pain had been effectively managed, according to Dr. Jaworowicz's notes. Also, Claimant testified regarding his own physical limitations. He stated that his pain increases if he stands for more than 15 minutes. He also stated that if he is sitting, he has to get up and move around every 30 minutes.

Although the ALJ's RFC determination may account for the physical limitations evidenced by medical documents in the record and Claimant's own testimony, the date of March 1, 2004 picked by the ALJ as the date that Claimant improved seems arbitrary. The ALJ indicated that March 1, 2004 was the correct date for two reasons: (1) the October 2003 Physical RFC Assessment completed by Dr. Conroy predicted that Claimant would be able to do sedentary work by March 2004, and (2) Claimant testified at the March 2005 hearing he had begun attending the race car track, fishing, and driving his daughter to and from school about one year prior to the March 2005 hearing.

These two justifications do not constitute substantial evidence to support the ALJ's determination that Claimant obtained his RFC on March 1, 2004. The October 2003 assessment was conducted by a non-examining state physician, and merely predicted what the Claimant's RFC may allow in March 2004. That evidence is far from convincing. Also, Claimant's testimony indicating that, for about the last year, he had attended a race car track a couple of times, occasionally gone fishing, and drove his daughter to school and back does not conclusively support the RFC determination by the ALJ. Importantly, no examining physician and no medical records indicate that Claimant's condition improved overnight on February 29, 2004. There is no indication in the medical records that March 1, 2004 is the correct date on which Claimant's condition improved. The ALJ has not drawn a logical bridge from substantial evidence in the record to his determination that, as of March 1, 2004, Claimant had the RFC determined by the ALJ. This case must be remanded for the ALJ to determine on what date substantial evidence in the record supports Claimant having an RFC that enables him to work.

For completeness, the court will address Claimant's argument that the ALJ did not

properly account for his depression and mental limitations when making the RFC determination. The medical record is clear that Claimant suffers from depression and has mental limitations. The dispute regards the extent to which Claimant's mental limitations affect his pain and his ability to work.

Claimant began taking Effexor in July 2004 for his depressive symptoms. He saw Dr. Pearson in September 2004, who noted that Claimant suffered from depression and anxiety. He suggested that Claimant use short-term medication and go to counseling.

On September 20, 2004, Claimant told Dr. Jaworowicz that his mood had stabilized on the Effexor. In November 2004, Claimant indicated that his depression and anxiety had gotten worse, and Dr. Jaworowicz increased his Effexor prescription. In May 2006, Claimant's Effexor prescription was doubled.

To determine the extent of Claimant's mental limitations, the ALJ referred Claimant to Dr. Hoffman in June 2006 for a psychiatric evaluation. The ALJ relied on Dr. Hoffman's assessment, which was the result of an hour and a half long interview. Dr. Hoffman opined that Claimant had only slight limitations in the ability to carry out detailed instructions, noting, "He did everything I asked him to do." (Tr. 563.) He also indicated that Claimant had slight limitations in interacting appropriately with supervisors and co-workers, and responding appropriately to changes in a routine work setting. (Tr. 564.) Dr. Hoffman found that Claimant had moderate limitations in interacting appropriately with the public, and in responding appropriately to work pressures in a usual work setting. (Tr. 654.)

The ALJ incorporated these limitations suggested by Dr. Hoffman into the RFC determination. The RFC determination provides that Claimant cannot attend to or carry out

complex/detailed instructions, and cannot perform complex/detailed tasks. The RFC determination also provides that Claimant retains the capacity to understand, recall, focus upon, attend to and carry out simple routine instructions and can perform simple, routine, tasks at a sustained/workmanlike pace. The ALJ also included in the RFC determination that Claimant cannot perform work which requires more than incidental contact with the general public or which requires frequent change in work processes and procedures. There is nothing in the record suggesting that Claimant's mental limitations are more than that included in the ALJ's RFC determination.

With regard to Claimant's physical and mental limitations, the ALJ's RFC determination is supported by substantial evidence in the record. The court affirms the ALJ's RFC determination. However, the ALJ picked March 1, 2004 as the date that Claimant's impairment improved such that his RFC allowed for work. That determination is not supported by substantial evidence in the record and the ALJ failed to draw a logical bridge from evidence in the record to that determination. Under these circumstances, the court has the option to remand this case to the ALJ to determine on what date his RFC determination became effective. However, given this court's analysis at Step Five, the court will not remand the case to the ALJ. Instead, this court will proceed with the analysis using the ALJ's RFC determination to find whether Claimant can perform past relevant work, or whether there exists a significant number of jobs in the national economy for which Claimant could be employed.

In this case, the ALJ found that Claimant could not perform past relevant work given his RFC. (Tr. 21–22.) Neither party disputes this determination. The court affirms the ALJ's Step Four determination, and proceed to Step Five.

**E.   Step Five: Does Any Other Work Exist  in Significant Numbers in the National Economy Which Accommodates the Claimant's Residual Functional Capacity and Vocational Factors?**

At step five, the Commissioner determines whether the claimant's RFC and vocational factors allow the claimant to perform any job which exists in the national economy in significant numbers.  20 C.F.R. § 404.1560(c).  The burden is on the Commissioner to provide evidence that demonstrates that other work exists.  20 C.F.R. § 404.1560(c)(2).  A vocational expert's testimony can satisfy the Commissioner's burden if it is reliable.  *Overman v. Astrue*, 546 F.3d 456, 2008 U.S. App. LEXIS 21016, at *18 (7th Cir. 2008).

The ALJ found that given Claimant's RFC, Claimant could perform a limited range of sedentary work.  (Tr. 22.)  Because Claimant's exertional capacity was limited below the level contemplated by the Guidelines, the ALJ relied on a vocational expert, Mr. Radke.  (Tr. 22.) Radke testified that given Claimant's RFC, which includes a limitation that Claimant could not perform detailed work, there exist in the regional economy the following jobs:  Production Inspector, of which there exist 400 jobs, Office Clerk, of which there exist 350 jobs, and Receptionists, of which there exist 250 jobs.  The VE testified that if Claimant could do detailed work, such as accurate filing and taking down numbers, then 2000 Office Clerk jobs and 3500 Receptionist jobs exist.

The ALJ wrote that the VE "opined that there existed the following unskilled sedentary jobs in the region of Northern Illinois: Administrative Support Worker (2,000); and Production Inspector (400), (4,400 nationally)."  (Tr. 22.)  The ALJ also wrote, "Regarding the Administrative Support Worker jobs identified by [the VE], the VE observed that although unskilled, certain aspects of the job may be seen as somewhat complex. [The VE] observed,

however, than an individual who is able to file accurately by address, by number or alphabetically would be able to perform such work. There is nothing of record to suggest an inability to perform such tasks." (Tr. 22.) The ALJ reasoned that because Hoffman's report indicated that Claimant had only a slight limitation in the capacity to carry out detailed instructions, Claimant would be able to file accurately and write down phone numbers. (Tr. 22.)

The ALJ's Step Five determination has several major flaws. First, the VE did not testify about an "Administrative Support Worker" job. The VE testified about the "Office Clerk" and "Receptionist" jobs. The court has no idea from where the ALJ got "Administrative Support Worker."

Second, assuming that "Administrative Support Worker" is the same thing as "Office Clerk" or "Receptionist," or both, then 2000 Administrative Support Worker jobs exist in the economy only if Claimant can do detailed work such as accurate filing by address, number, or alphabetically. The ALJ found that Claimant could perform such duties because Dr. Hoffman indicated only slight limitations in Claimant's ability to carry out detailed instructions. The ALJ wrote,"There is nothing in the record to suggest an inability to perform such tasks." (Tr. 22.)

However, the ALJ's determination that Claimant can do the detailed tasks of accurate filing as an administrative support worker is directly contrary to the ALJ's RFC determination. The ALJ's RFC determination specifically states that Claimant "cannot attend to or perform complex/detailed tasks." (Tr. 16.) The ALJ cannot modify his RFC determination during the Step Five analysis to fit certain jobs. This is a major error.

This court already affirmed the ALJ's RFC determination, *supra*, and finds that the VE's testimony was reliable. The VE testified that given Claimant's RFC (including the limitation on

detailed work), there exists only 1000 jobs exist in the regional economy: Production Supervisor (400), Office Clerk (350), and Receptionist (250). (Tr. 694–95.) That is not a significant number of jobs. It does not matter on what date Claimant's impairment improved such that he obtained the RFC that he had at the time of the ALJ's decision. The Commissioner has not met his burden of proving that there exist a significant number of jobs in the regional economy for which Claimant could be employed given the ALJ's RFC determination. As such, the court reverses the ALJ's Step Five determination without remand, and finds that Claimant is disabled and has been since February 26, 2003.

**VIII.**        **Conclusion**

For the forgoing reasons, the Commissioner's motion for summary judgment is denied and Claimant's motion for summary judgment is granted. The court reverses the Commissioner's decision under sentence four of section 405(g) without remand. *See* 42 U.S.C. § 405(g). Judgment will be entered in favor of Claimant.

**E N T E R:**

_____
**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE**: July 26, 2010